13-1872-cv (L)
Luitpold Pharm., Inc. v. Ed. Geistlich Söhne A.G.

 United States Court of Appeals
 FOR THE SECOND CIRCUIT 
 ______________  
  
 August Term, 2013 
  
 (Argued: June 25, 2014          Decided:  April 10, 2015) 
  
 Docket Nos. 13‐1872‐cv (L), 13‐1934‐cv (XAP) 
 ______________  
 
 LUITPOLD PHARMACEUTICALS, INC., 
  
 Plaintiff‐Counter‐Defendant‐
 Appellant‐Cross‐Appellee, 
 
 –v.–  
  
 ED. GEISTLICH SÖHNE A.G. FÜR CHEMISCHE INDUSTRIE, 
  
 Defendant‐Counterclaimant‐
 Appellee‐Cross‐Appellant, 
  
 OSTEOMEDICAL LTD., 
  
 Defendant‐Appellee.* 
 ______________  
 
B  e  f  o  r  e :     
 
 CABRANES, CARNEY, and DRONEY, Circuit Judges. 
 

*
 The Clerk of Court is respectfully directed to amend the official caption to conform with the  
above.
 1 ______________  
 2  
 3 In this commercial contract dispute, Plaintiff‐Counter‐Defendant Luitpold 
 4 Pharmaceuticals, Inc., appeals from an April 17, 2013 judgment of the United 
 5 States District Court for the Southern District of New York (Katherine B. Forrest, 
 6 Judge) to the extent that it made final (1) the court’s earlier dismissal, under Fed. 
 7 R. Civ. P. 12(b)(6), of certain of Luitpold’s claims, and (2) the court’s grant of 
 8 summary judgment to Defendant‐Counterclaimant Ed. Geistlich Söhne A.G. Für 
 9 Chemische Industrie and Defendant Osteomedical Ltd. on Luitpold’s remaining 
10 claims.  Geistlich cross‐appeals, challenging the court’s grant of summary 
11 judgment to Luitpold on Geistlich’s counterclaims. 
12  
 VACATED AND REMANDED.  
 ______________ 
13  
14 HUNTER T. CARTER (Mark Bloom, Jennifer Bougher,  
15 Jeff Leung, and Martin Cunniff, on the brief), Arent 
16 Fox LLP, New York, New York and Washington, 
17 D.C., for Luitpold Pharmaceuticals, Inc.  
18  
19 JOSEPH W. HAMMELL (David Y. Trevor, Shari L.J. Aberle,  
20   Erin P. Davenport, and Christopher G.  
21   Karagheuzoff, on the brief), Dorsey & Whitney  
22 LLP, Minneapolis, Minnesota, and New York, 
23 New York, for Ed. Geistlich Söhne A.G. Für 
24 Chemische Industrie and Osteomedical Ltd.  
 ______________ 
25  

 2 
 1 SUSAN L. CARNEY, Circuit Judge:   

 2 In this commercial contract dispute, Plaintiff‐Counter‐Defendant Luitpold 

 3 Pharmaceuticals, Inc. (“Luitpold”) appeals from an April 17, 2013 judgment of 

 4 the United States District Court for the Southern District of New York (Katherine 

 5 B. Forrest, Judge) to the extent that it made final (1) the court’s dismissal, under 

 6 Rule 12(b)(6) of the Federal Rules of Civil Procedure, of certain of Luitpold’s 

 7 claims, and (2) the court’s grant of summary judgment to Defendant‐

 8 Counterclaimant Ed. Geistlich Söhne A.G. Für Chemische Industrie (“Geistlich”) 

 9 and Defendant Osteomedical Ltd. (“Osteomedical”) on Luitpold’s remaining 

10 claims.  Geistlich cross‐appeals, challenging the court’s grant of summary 

11 judgment to Luitpold on Geistlich’s counterclaims. 

12 Because we conclude that the District Court erred in its decisions on the 

13 motions to dismiss and for summary judgment, we VACATE and REMAND. 

14  

15 BACKGROUND 

16 Many of the facts are not in dispute; we flag those that are.   

17 Luitpold is a New York corporation engaged in the development and 

18 marketing of an array of drugs and medical devices, including dental implant 

  
 3 
 1 products.  Geistlich is a Swiss chemical and pharmaceutical corporation that 

 2 develops and manufactures various dental products.  Osteomedical is an Irish 

 3 corporation and a Geistlich affiliate.  Osteomedical owned the patents and 

 4 trademarks for the two groups of dental products at issue in this case—namely, 

 5 Bio‐Oss, Bio‐Oss Collagen, and Bio‐Tape (collectively, the “Bio‐Oss Products”), 

 6 and Bio‐Gide, Bio‐Gide Perio, and Bio‐Gide Comp. (collectively, the “Bio‐Gide 

 7 Products”).  Osteomedical has since transferred those assets to Geistlich.  The 

 8 Bio‐Oss and Bio‐Gide Products are used to aid bone and tissue growth in dental 

 9 patients following tooth removal or other dental procedures. 

10  

11 A. Agreements Among the Parties and Geistlich’s “Termination Notice” 

12 In the early 1990s, following several failed attempts to market its Bio‐Oss 

13 Products in the United States through other companies, Geistlich engaged 

14 Luitpold in negotiations regarding a potential collaboration.  In March 1994, the 

15 parties entered into interdependent commercial and license agreements 

16 (respectively, the “Commercial Agreement” and the “1994 License Agreement”) 

17 that established a distribution relationship among Luitpold, Geistlich, and 

  
 4 
 1 Osteomedical for the sale of Geistlich’s dental products throughout the United 

 2 States and Canada and their territories.

 3 In the Commercial Agreement, Geistlich agreed, among other things, to 

 4 supply Luitpold with all of Luitpold’s requirements for the Bio‐Oss Products and 

 5 to aid Luitpold in the marketing and distribution of those products in the 

 6 covered territory.  See Commercial Agreement ¶ 2.01.  In exchange, Luitpold 

 7 agreed to purchase from Geistlich—at a price equal to a fixed percentage of 

 8 Luitpold’s “net sales”—its requirements for the Bio‐Oss Products, and to use its 

 9 “best efforts” to enter and develop markets in those products within the covered 

10 territory.  See id. ¶¶ 2.02‐.03, 7.01.  Luitpold also agreed to pay Geistlich a $15 

11 million fee.  See id. ¶ 6.01. 

12 In the 1994 License Agreement, Osteomedical—which then held the patent 

13 and trademark rights in the Bio‐Oss Products—granted Luitpold (1) “an 

14 exclusive, non‐transferable license . . . to market, sell, distribute and use” the Bio‐

15 Oss Products for covered uses in the covered territory;  (2) “an exclusive, non‐

16 transferable license . . . to use the TRADEMARKS” relating to the Bio‐Oss 

17 Products in the covered territory “in connection with the [products’] marketing, 

18 sale, distribution, and use”; and (3) an “an exclusive, non‐transferable license” to 

  
 5 
 1 use the “Osteomedical” trade name.  1994 License Agreement ¶ 3.02.  The 

 2 agreement emphasized, however, that Osteomedical was “the exclusive owner of 

 3 the TRADEMARKS and all of the goodwill thereto, and [that] except for the 

 4 rights licensed [t]herein, [Osteomedical] . . . retain[ed] the full rights to the 

 5 TRADEMARKS, the goodwill relating thereto and all registrations granted 

 6 thereon.”  Id. ¶ 6.03.  Luitpold agreed to pay Osteomedical a $5 million fee, as 

 7 well as a royalty equaling a fixed percentage of its net sales for the products, as 

 8 consideration for the licenses.  See id. ¶¶ 4.01, 5.01.

 9 Also in March 1994, all three parties signed a letter agreement (the “1994 

10 Letter Agreement”) that stated, with respect to the Commercial Agreement and 

11 the 1994 License Agreement, that “the rights and obligations set forth in the one 

12 agreement cannot be severed or performed separately or apart from those rights 

13 and obligations set forth in the other agreement.”  1994 Letter Agreement at 1.   

14 Thus, under the 1994 Letter Agreement, the breach of either the Commercial 

15 Agreement or the 1994 License Agreement would be deemed a breach of the 

16 other, and the termination of one would result in the immediate termination of 

17 the other.  See id. at 2. 

  
 6 
 1 In the years following their execution of the 1994 Agreements, the parties 

 2 entered into several additional agreements and amendments to the original 

 3 agreements.  In 1996, for example, Geistlich and Luitpold entered into an 

 4 Exclusive Distribution Agreement under which Luitpold received from Geistlich 

 5 the exclusive right to market, distribute, and sell certain Geistlich Bio‐Oss 

 6 products in additional territory—certain countries in Central and South 

 7 America—and Luitpold agreed not to sell any identical or similar products in 

 8 that territory.  Also in 1996, Geistlich and Luitpold amended the Commercial 

 9 Agreement to include Mexico as covered territory.  

10 Further, in 1998, through another amendment to the Commercial 

11 Agreement and the execution of a second license agreement (the “1998 License 

12 Agreement”), Geistlich and Osteomedical granted to Luitpold rights relating to 

13 Geistlich’s Bio‐Gide Products.  The 1998 License Agreement, with terms parallel 

14 to those of the 1994 License Agreement, conferred upon Luitpold the same rights 

15 in the Bio‐Gide Products as Luitpold held in the Bio‐Oss Products.  And like the 

16 agreements entered in 1994, the 1998 License Agreement was accompanied by a 

17 letter agreement (the “1998 Letter Agreement”) that provided, among other 

18 things, that termination of the Commercial Agreement would result in the 

  
 7 
 1 immediate termination of the 1998 License Agreement and vice versa.  See 1998 

 2 Letter Agreement at 2.  Luitpold agreed to pay Osteomedical a $6 million fee, as 

 3 well as a royalty, for these additional licenses.  See 1998 License Agreement 

 4 ¶¶ 4.01, 5.01. 

 5 To carry out its responsibilities under the agreements, and at Geistlich’s 

 6 encouragement, Luitpold in 1994 created a separate division, Osteohealth, under 

 7 which name it sold and marketed Geistlich products over the next decade and a 

 8 half.  Osteohealth became a market leader in the field of dental implant products 

 9 within the covered territory, and, through Osteohealth, Luitpold eventually 

10 made substantial profits based on the Geistlich relationship.  Geistlich calculated 

11 that those profits amounted to over $100 million. 

12 On September 13, 2010—a little more than sixteen years after the first 

13 agreements were signed—Geistlich, which by then had assumed Osteomedical’s 

14 rights under the License Agreements, declared its intent to terminate the 

15 Commercial Agreement and the 1994 and 1998 License Agreements in a letter to 

16 Luitpold that it labeled “Termination Notice.”  See Letter from Geistlich to 

17 Luitpold dated Sept. 13, 2010.  In that letter, Geistlich informed Luitpold that it 

18 was terminating their distribution relationship, without compensation to 

  
 8 
 1 Luitpold, as of March 31, 2011—a date that Geistlich later revised to June 30, 

 2 2011.  Geistlich did not allege any material breach of the parties’ agreements; 

 3 rather, Geistlich declared that the agreements in question had been in effect for a 

 4 “reasonable” time and that therefore, under New York law, Geistlich could 

 5 unilaterally terminate them upon reasonable notice given to Luitpold.  Id. at 1. 

 6  

 7 B. District Court Proceedings 

 8   On February 1, 2011, Luitpold filed a multi‐count Complaint against 

 9 Geistlich and Osteomedical (together, “Defendants”) in the United States District 

10 Court for the Southern District of New York, properly invoking that court’s 

11 diversity jurisdiction.  The Complaint sought declaratory relief, specific 

12 performance, damages, and prejudgment attachment of Geistlich patents and 

13 trademarks based on Defendants’ alleged breach of the various agreements.  

14 Count I alleged principally that the notice purporting to effect termination was 

15 invalid and that Geistlich had failed to meet its supply obligations under the 

16 Commercial Agreement.  Counts II and V alleged that Geistlich had repudiated 

17 and anticipatorily breached the Commercial Agreement and the 1994 and 1998 

18 License Agreements by delivering the Termination Notice.  Counts IV and VI 
  
 9 
 1 alleged that Geistlich breached the 1994 and 1998 License Agreements by 

 2 advertising Bio‐Oss and Bio‐Gide Products in the United States in violation of 

 3 Luitpold’s exclusive rights in the trademarks to those products in that territory.  

 4 Count VII alleged that Luitpold was entitled to prejudgment attachment of the 

 5 patents and trademarks at issue based on its claims for breach of the various 

 6 agreements and the likelihood that it would succeed on those claims.  The parties 

 7 eventually stipulated to the dismissal, with prejudice, of the remaining counts of 

 8 the Complaint (Counts III, VIII, and IX), see Stipulation Pursuant to F.R.C.P. Rule 

 9 41(a)(1), filed Nov. 7, 2012, and these are not at issue in this appeal. 

10   Geistlich and Osteomedical moved in April 2011 to dismiss all counts 

11 relevant here.  The District Court denied the motion in part, but granted the 

12 motion as to Counts IV and VI, concluding that Defendants could not have 

13 violated Luitpold’s contractual rights relating to the trademarks through direct 

14 advertising because Defendants had retained ownership of the trademarks.  See 

15 Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie (“Luitpold 

16 I”), No. 11 Civ. 681 (KBF), 2012 WL 1372160, at *8 (S.D.N.Y. Apr. 17, 2012). 

17   In May 2012, Defendants filed their responsive pleading.  In the pleading, 

18 Geistlich stated four counterclaims, two of which are relevant here.  Count II of 

  
 10 
 1 the counterclaims alleged that Luitpold breached the Commercial Agreement by 

 2 failing to pay Geistlich the agreed‐upon purchase price.  Count III of the 

 3 counterclaims alleged principally that Luitpold breached the “best efforts” 

 4 provision in the Commercial Agreement when it acquired the rights to and sold 

 5 competing products. 

 6   In September 2012, following the close of discovery, Defendants moved for 

 7 summary judgment on Luitpold’s remaining claims.  Concluding that no 

 8 reasonable factfinder could find that the Commercial and License Agreements 

 9 were not terminable at will, the District Court in a January 2013 order granted 

10 Defendants’ motion and dismissed Counts I, II, V, and VII of Luitpold’s 

11 Complaint.  The court reasoned that each of those counts rested on the premise—

12 mistaken, in the court’s view—that Geistlich had breached the agreements 

13 because its Termination Notice was invalid.  See Luitpold Pharm., Inc. v. Ed. 

14 Geistlich Sohne A.G. Fur Chemische Industrie (“Luitpold II”), No. 11 Civ. 681 (KBF), 

15 2013 WL 208908, at *5‐11 (S.D.N.Y. Jan. 15, 2013).  

16   In February 2013, after the District Court dismissed without prejudice 

17 Geistlich’s other counterclaims at Geistlich’s request, Luitpold and Geistlich filed 

18 cross‐motions for summary judgment on Counts II (the purchase price 

  
 11 
 1 counterclaim) and III (the “best efforts” counterclaim).  On both counts, the 

 2 District Court denied Geistlich’s motion and granted summary judgment to 

 3 Luitpold.   See Luitpold Pharm., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische 

 4 Industrie (“Luitpold III”), No. 11 Civ. 681 (KBF), 2013 WL 1651624, at *8‐10 

 5 (S.D.N.Y. Apr. 15, 2013).  These rulings drew the litigation to a close in the 

 6 district court, with no party recovering damages or other relief on any claim or 

 7 counterclaim. 

 8   Following entry of final judgment in April 2013, Luitpold timely appealed.  

 9 Geistlich timely cross‐appealed. 

10  

11 DISCUSSION  

12 A. Dismissal of Counts IV and VI of the Complaint 

13 We review a district court’s grant of a motion to dismiss under Rule 

14 12(b)(6) de novo, accepting all factual allegations in the complaint as true, and 

15 drawing all reasonable inferences in the plaintiff’s favor.  Cnty. of Erie v. Colgan 

16 Air, Inc., 711 F.3d 147, 149 (2d Cir. 2013).  “To survive a motion to dismiss, a 

17 complaint must contain sufficient factual matter, accepted as true, to state a claim 

18 to relief that is plausible on its face.”  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) 

  
 12 
 1 (internal quotation marks omitted).  In our evaluation of the adequacy of a 

 2 complaint, we consider as part of the complaint any written instrument attached 

 3 as an exhibit to the complaint.  See Fed. R. Civ. P. 10(c). 

 4 The 1994 and 1998 License Agreements, each attached as an exhibit to the 

 5 Complaint, grant to Luitpold, among other things, “an exclusive . . . license . . . to 

 6 use the TRADEMARKS in the TERRITORY in connection with the marketing, 

 7 sale, distribution, and use” of the Bio‐Oss and Bio‐Gide Products in their 

 8 respective fields of use.  1994 and 1998 License Agreements ¶ 3.02(b).  In Counts 

 9 IV and VI of its Complaint, Luitpold alleged that Geistlich breached those 

10 agreements by using the BIO‐OSS and BIO‐GIDE marks (among the trademarks 

11 covered by the License Agreements) to advertise products Geistlich called 

12 “Geistlich Bio‐Oss” and “Geistlich Bio‐Gide” within the United States.  See 

13 Compl. ¶¶ 92, 107.   Luitpold alleged that this behavior began even before 

14 Geistlich sent its Termination Notice.  See id. ¶¶ 93, 108. 

15 The District Court dismissed Counts IV and VI on the ground that the 

16 License Agreements did not “grant[] plaintiff exclusive rights as against 

17 Geistlich.”  Luitpold I, 2012 WL 1372160, at *8.  The court focused on paragraphs 

18 6.01 to 6.04 of the respective agreements, and concluded that “[t]here is no doubt 

  
 13 
 1 . . . that Geistlich retains the entire, right, title, and interest in and to the 

 2 trademarks.”  Id.  Paragraph 6.01 provides that “the entire right, title and interest 

 3 in and to [the] TRADEMARKS shall remain the property of LICENSOR during 

 4 the term hereof.”  1994 and 1998 License Agreements ¶ 6.01. 

 5 On appeal, Luitpold contends that the District Court overlooked language 

 6 in the agreements demonstrating that Luitpold’s rights to use the relevant 

 7 trademarks in the covered territory were exclusive even as to Geistlich.  Luitpold 

 8 points in particular to paragraph 6.03 of the respective License Agreements, 

 9 which provides in relevant part: 

10 LICENSEE  agrees  that  LICENSOR  is  the  exclusive  owner  of  the 
11 TRADEMARKS  and  all  of  the  goodwill  thereto,  and  except  for  the 
12 rights  licensed  herein,  LICENSOR  shall  retain  the  full  rights  to  the 
13 TRADEMARKS,  the  goodwill  relating  thereto  and  all  registrations 
14 granted thereon. 
15  
16 1994 and 1998 License Agreements ¶ 6.03 (emphasis added).   

17 On a motion to dismiss a breach of contract claim, “we should resolve any 

18 contractual ambiguities in favor of the plaintiff.”  Subaru Distribs. Corp. v. Subaru 

19 of Am., Inc., 425 F.3d 119, 122 (2d Cir. 2005).  Particularly in light of the carve‐out 

20 expressed in paragraph 6.03, the agreements here were at the very least 

21 ambiguous with respect to whether Luitpold’s rights to use the trademarks were 

  
 14 
 1 exclusive of Geistlich’s notwithstanding Geistlich’s retention of title to them:  

 2 One could reasonably read the agreements to mean that the parties did not agree 

 3 to preserve for Geistlich the right to use the BIO‐OSS and BIO‐GIDE marks in the 

 4 United States and other covered territory during the license term. 

 5 Defendants offer no persuasive reason to conclude otherwise.  According 

 6 to Defendants, Geistlich’s retained ownership rights in the trademarks rendered 

 7 Luitpold’s license in the marks necessarily non‐exclusive as to Geistlich.  But a 

 8 licensor can maintain its ownership of a trademark while granting a license that 

 9 is exclusive even as to the licensor.  See 3 McCarthy on Trademarks and Unfair 

10 Competition § 18.44.50 (4th ed. 2015) (“If the license is exclusive to a licensee, 

11 then the licensor’s own use in conflict with the licensed use can be a breach of 

12 contract because it is inconsistent with the licensee’s exclusive right to use.”); cf. 

13 Davis v. Blige, 505 F.3d 90, 99‐100 (2d Cir. 2007) (observing that “exclusive 

14 licenses . . . grant to the licensee the exclusive right—superior even to copyright 

15 owners’ rights—to use the copyrighted material in a manner as specified by the 

16 license agreement”).   

17 Defendants’ further argument—that the District Court’s dismissal of 

18 Counts IV and VI should be affirmed on the alternative ground that Luitpold has 

  
 15 
 1 failed adequately to plead damages—is no more persuasive.  Luitpold alleges in 

 2 its Complaint that Geistlich’s advertisement in the United States of “products 

 3 [Geistlich] calls ‘Geistlich Bio‐Oss’ and ‘Geistlich Bio‐Gide’” “has caused 

 4 Luitpold to suffer damages and immeasurable harm to its goodwill.”  Compl. 

 5 ¶¶ 53, 92, 107.  According to Luitpold, “[f]rom September 1994 to September 

 6 2010, Luitpold . . . spent over $60 million dollars in an effort to build up 

 7 Osteohealth’s association with the licensed products, including,” among other things, 

 8 “updating the product marketing materials with new clinical information, 

 9 conducting training sessions for the sales team on this new clinical information, 

10 securing and maintaining sponsorships, and cultivating key opinion leader 

11 relationships.”  Compl. ¶ 46 (emphasis added).  And Luitpold alleges that it paid 

12 $11 million in fees for the licenses under the 1994 and 1998 License Agreements.  

13 See Compl. ¶¶ 21, 28.  Defendants contend that Luitpold’s damages claim is 

14 implausible because Luitpold could not have been harmed by Geistlich’s 

15 advertising of products for which Luitpold was the exclusive distributor.  This 

16 ignores, however, that not all advertising is beneficial.  It is certainly plausible 

17 that Geistlich’s advertising of Bio‐Oss and Bio‐Gide Products as “Geistlich” 

18 products caused Luitpold to suffer damage, including to its goodwill, by 

  
 16 
 1 undermining the products’ association with Luitpold’s Osteohealth brand.  See, 

 2 e.g., Borne Chem. Co. v. Dictrow, 445 N.Y.S.2d 406, 413 (App. Div. 2d Dep’t 1981) 

 3 (explaining that a court may order damages relating to wrongful diversion of 

 4 goodwill or competition in violation of a restrictive covenant).  Further, even if 

 5 Luitpold’s allegations of substantial damages were, as Defendants argue, too 

 6 “speculative” to support its claims, Luitpold would have plausible claims for 

 7 nominal damages.  See Ely‐Cruikshank Co. v. Bank of Montreal, 81 N.Y.2d 399, 402 

 8 (1993) (“[N]ominal damages are always available in breach of contract 

 9 actions . . . .” (internal quotation marks omitted)); cf. Contemporary Mission, Inc. v. 

10 Famous Music Corp., 557 F.2d 918, 926 (2d Cir. 1977) (explaining that, under New 

11 York law, “[w]hen the existence of damage is uncertain or speculative, the 

12 plaintiff is limited to the recovery of nominal damages”). 

13   Luitpold has thus plausibly alleged breaches of contract by Geistlich based 

14 on Geistlich’s use of the BIO‐OSS and BIO‐GIDE trademarks in violation of 

15 Luitpold’s exclusive licenses.  The District Court’s dismissal of Counts IV and VI 

  
 17 
 1 was therefore in error, and those counts must be reinstated as to Geistlich and 

 2 Osteomedical.1 

 3  

 4 B. Summary Judgment on Luitpold’s Remaining Claims 

 5 We review de novo a district court’s summary judgment grant, applying the 

 6 same standard as the district court.  See Westinghouse Credit Corp. v. D’Urso, 278 

 7 F.3d 138, 145 (2d Cir. 2002).  Summary judgment in favor of the moving party is 

 8 proper “if the movant shows that there is no genuine dispute as to any material 

 9 fact and the movant is entitled to judgment as a matter of law.”  Fed. R. Civ. P. 

10 56(a).  In deciding whether there exists a genuine dispute as to any material fact, 

11 the court must construe the evidence in the light most favorable to the 

12 nonmoving party, and draw all reasonable inferences in the nonmoving party’s 

13 favor.  Rubens v. Mason, 527 F.3d 252, 254 (2d Cir. 2008). 

14 Under New York law—which governs here, according to the agreements’ 

15 terms—“a contract is to be construed in accordance with the parties’ intent, 

16 which is generally discerned from the four corners of the document itself.”  MHR 

 1  Although the briefs on appeal and the allegations in the Complaint focus on Geistlich’s 
 conduct, Luitpold appealed from the judgment to the extent that it granted the motion to 
 dismiss of both Defendants.  We leave it to the parties and the District Court on remand to 
 address Osteomedical’s status as a defendant. 
  
 18 
 1 Capital Partners LP v. Presstek, Inc., 12 N.Y.3d 640, 645 (2009).  In construing a 

 2 contract, a court should read the contract as a whole, see Westmoreland Coal Co. v. 

 3 Entech, Inc., 100 N.Y.2d 352, 358 (2003), and avoid any interpretation that would 

 4 render a contractual provision without force and effect, see Two Guys from 

 5 Harrison‐N.Y., Inc. v. S.F.R. Realty Assocs., 63 N.Y.2d 396, 403 (1984); Corhill Corp. v. 

 6 S.D. Plants, Inc., 9 N.Y.2d 595, 599 (1961).  Only when a court finds ambiguity in 

 7 the parties’ written agreement may it look to extrinsic evidence to discern the 

 8 parties’ intent.  See Schron v. Troutman Sanders LLP, 20 N.Y.3d 430, 436 (2013).  A 

 9 contract is ambiguous when “[r]easonable minds could differ” as to its meaning.  

10 Van Wagner Adver. Corp. v. S&M Enters., 67 N.Y.2d 186, 191 (1986). 

11 Because facial ambiguity in a contract will require the factfinder to 

12 examine extrinsic evidence to determine the contract’s effect, and because such 

13 extrinsic evidence is most often mixed, a court generally will not grant summary 

14 judgment on a contract claim when the operative language is ambiguous.  See 

15 Compagnie Financiere de CIC et de L’Union Europeenne v. Merrill Lynch, Pierce, 

16 Fenner & Smith Inc., 232 F.3d 153, 157‐58 (2d Cir. 2000).   No genuine dispute will 

17 exist, however, where “the evidence presented about the parties’ intended 

18 meaning is so one‐sided that no reasonable person could decide the contrary,” or 

  
 19 
 1 “if the non‐moving party fails to point to any relevant extrinsic evidence 

 2 supporting that party’s interpretation of the language.”  Id. at 158 (internal 

 3 quotation marks and brackets omitted).  Whether a contract is ambiguous in the 

 4 first place presents a question of law.  See id.; Greenfield v. Philles Records, Inc., 98 

 5 N.Y.2d 562, 569 (2002). 

 6   On Defendants’ motion for summary judgment following the close of 

 7 discovery, the District Court dismissed the remaining counts of Luitpold’s 

 8 Complaint.  Each of Luitpold’s remaining claims depended on the premise that 

 9 the Commercial and License Agreements were not terminable at will, and that 

10 Geistlich’s September 2010 Termination Notice constituted a breach of those 

11 agreements.  Since, under the Letter Agreements, termination of the Commercial 

12 Agreement would result in the termination of the License Agreements and vice 

13 versa, a provision rendering either the Commercial Agreement or the License 

14 Agreements terminable at will would have rendered all agreements terminable at 

15 will. 

16 Article V of the Commercial Agreement provides that the agreement’s term 

17 “shall continue until such time as [the agreement] is terminated pursuant to the 

18 provisions of this ARTICLE V and/or ARTICLE IX hereof.”  Commercial 

  
 20 
 1 Agreement ¶ 5.01.  Paragraph 5.02 of Article V expressly gives Geistlich a “right 

 2 to terminate” when Luitpold fails to meet certain specified sales targets.  See id. 

 3 ¶ 5.02.  Article IX of the Commercial Agreement is entitled “Termination.”  

 4 Because it is critical to our reading of the agreement, we set it forth here at some 

 5 length.  It provides in relevant part as follows: 

 6  
 7 9.01  Subject to all of the provisions set forth in this COMMERCIAL 
 8 AGREEMENT,  this  COMMERCIAL  AGREEMENT  may  be 
 9 terminated by mutual consent of the parties in writing at any time. 
10  
11 9.02  In  the  event  that  any  of  the  terms  or  provisions  hereof  are 
12 incurably  breached,  the  non‐breaching  party  may  immediately 
13 terminate this COMMERCIAL AGREEMENT by written notice.  For 
14 purposes  of  this  COMMERCIAL  AGREEMENT,  an  “incurable” 
15 breach shall be committed when, 
16   (a)  [a party enters into bankruptcy proceedings,] 
17   (b)  [Luitpold fails to meet the performance standards    
18 outlined in paragraph 5.02,] or 
19 (c)  [Luitpold fails to make payments when due unless  
20 otherwise specifically excused]. 
21  
22 9.03  In  the  event  that  this  COMMERCIAL  AGREEMENT  is 
23 terminated  for  any  reason  whatsoever,  except  as  specifically 
24 provided otherwise in this COMMERCIAL AGREEMENT, the duties 
25 and obligations of the breaching party which have accrued prior to 
26 termination shall not be released or discharged by such termination.  
27 Further,  termination  of  this  COMMERCIAL  AGREEMENT  for  any 
28 reason whatsoever shall be ineffective to release or discharge for any 
29 reason  the  continuing  obligations  hereof,  including  but  not  limited 
30 to the obligations of confidentiality. 

  
 21 
 1  
 2 9.04  It  is  expressly  agreed  and  understood  that  except  as 
 3 specifically  set  forth  in  Paragraph  9.04(a)  below,  termination  of  this 
 4 COMMERCIAL AGREEMENT  for  any  reason  shall  not  excuse  any 
 5 of  the  payments  contemplated  by  . . .  this  COMMERCIAL 
 6 AGREEMENT  nor  shall  termination  of  this  COMMERCIAL 
 7 AGREEMENT serve as a basis for BUYER obtaining a refund of any 
 8 of  the  payments  made  in  accordance  with  . . .  this  COMMERCIAL 
 9 AGREEMENT. 
10 (a)  The only circumstances which shall excuse payments  
11 not yet made by BUYER . . . , or entitle BUYER to a  
12 refund . . . is GEISTLICH’s failure to supply BUYER’s  
13 requirements of PRODUCT ordered in accordance with  
14 the terms and conditions of this COMMERCIAL  
15 AGREEMENT . . . . 
16  
17  
18 Id. ¶¶ 9.01‐.04. 
19  
20 Looking to these provisions, the District Court concluded in a January 2013 

21 decision and order that “[t]he Commercial Agreement’s language relating to 

22 termination is ambiguous.”  Luitpold II, 2013 WL 208908, at *6.  The court 

23 acknowledged that paragraphs “9.01 and 9.02 appear to allow both parties to 

24 terminate the agreement together upon mutual consent, or either party to 

25 terminate the agreement unilaterally upon the other party’s ‘incurable breach.’”  

26 Id.  But the court found ambiguity in paragraph 9.03, namely, “whether 

27 [paragraph] 9.03 . . . allows for unilateral termination of the contract for ‘any 

  
 22 
 1 reason whatsoever’—as it says—or whether that [paragraph] equates such 

 2 termination with a breach of the contract.”  Id. at *11.   The court provided this 

 3 explanation: 

 4 Read  with  the  former  provisions,  [paragraph]  9.03  could  as  easily 
 5 mean:  “A termination of this agreement for any reason whatsoever 
 6 will  not  discharge  a  party  in  breach’s  existing  obligations,  except  if 
 7 this  agreement  provides  for  different  consequences”—an 
 8 interpretation defendants[] would surely prefer—as:  “A termination 
 9 for  any  reason  whatsoever,  other  than  those  reasons  specifically 
10 listed in 9.01 and 9.02 is a breach of this agreement, which will not 
11 discharge  existing  obligations  of  the  breaching  party  [and  indeed, 
12 subject  the  breaching  party  to  liability  for  breach  of  contract]”—a 
13 reading more in line with Luitpold’s theory. 
14  
15 Luitpold II, 2013 WL 208908, at *6.   
16  
17 After examining the evidence proffered by the parties in support of their 

18 favored interpretations—principally testimony by Geistlich’s President Dr. Peter 

19 Geistlich, who negotiated the agreement, on the one hand, and testimony by 

20 Luitpold’s former Vice President (and current President and Chief Executive 

21 Officer) Mary Jane Helenek, who did not directly negotiate the agreement, on the 

22 other—the court dismissed Luitpold’s evidence as speculative and concluded 

23 that it failed to create a genuine dispute as to the parties’ intent.  See id. at *3‐4, *7‐

24 11.  Focusing on Dr. Geistlich’s testimony that “‘the final understanding was that 

  
 23 
 1 we can understand the termination clause in the sense that we can cancel the 

 2 contract at any time for any reason,’” the court concluded that “a reasonable 

 3 factfinder could only find that unilateral termination is permissible.”  Id. at *7, 

 4 *11. 

 5   Luitpold argues that this Court should vacate the District Court’s grant of 

 6 summary judgment in favor of Geistlich and Osteomedical.  According to 

 7 Luitpold, the District Court (1) misinterpreted the “survival clause” in paragraph 

 8 9.03 of the Commercial Agreement to be ambiguous with respect to whether it 

 9 granted a unilateral right of termination “for any reason whatsoever”; and (2) 

10 usurped the role of the jury by disregarding Luitpold’s proffered extrinsic 

11 evidence on contractual intent and failing to view the evidence in the light most 

12 favorable to Luitpold.   

13 We agree with Luitpold that the District Court erred in ruling that 

14 paragraph 9.03 was ambiguous with regard to whether it confers a right of 

15 termination “for any reason.”  Paragraph 9.03 does not purport to speak to when 

16 a party is permitted to terminate the contract; rather, it governs a different 

17 question: which “duties and obligations of the breaching party” survive 

18 termination of the contract.  Similarly, paragraph 9.04, which the District Court 

  
 24 
 1 did not discuss but which contains language echoing the contested language of 

 2 paragraph 9.03, also by its terms governs the survival of obligations following 

 3 the agreement’s termination, and contains no language purporting to confer a 

 4 right of termination. 

 5 To understand when the contract may be terminated, one must look 

 6 elsewhere: namely, to paragraphs 5.02, 9.01, and 9.02.  These provisions expressly 

 7 give Geistlich a right of termination when Luitpold fails to meet certain sales 

 8 targets (¶ 5.02); both parties a right of termination upon written mutual consent 

 9 (¶ 9.01); and either party the right of termination in the case of an “incurable” 

10 breach by the other (¶ 9.02).  In paragraphs 9.03 and 9.04, the words “for any 

11 reason” within the phrases “terminated for any reason whatsoever” and 

12 “termination . . . for any reason” can be construed only within the bounds of the 

13 concept of termination as expressly defined elsewhere in the agreement, and do 

14 not in themselves give rise to separate permissible grounds for termination.  The 

15 agreement is unambiguous in this respect.2 

 Notably, even the reading of paragraph 9.03 that the District Court attributed to Defendants— 
 2  

 that “‘[a] termination of this agreement for any reason whatsoever will not discharge a party in  
 breach’s existing obligations, except if this agreement provides for different consequences,’” see  
 Luitpold II, 2013 WL 208908, at *6—does not go so far as to provide expressly that either party  
 may terminate the agreement for any reason or for no reason.  Consistent with the plain  
  
 25 
 1 Hewing to a “cardinal rule” of construction, Corhill Corp., 9 N.Y.2d at 599, 

 2 this interpretation of paragraphs 9.03 and 9.04 avoids rendering the agreement’s 

 3 other termination provisions superfluous.  If either party could terminate the 

 4 agreement at will, there would be no need for the parties to secure mutual, 

 5 written consent for termination, see Commercial Agreement ¶ 9.01, or to wait 

 6 until the other party had “incurably breached” before terminating the agreement, 

 7 see id. ¶ 9.02.  Geistlich’s special right of termination in cases in which Luitpold 

 8 failed to meet certain sales targets, see id. ¶ 5.02, would be superfluous as well. 

 9 We thus conclude that the Commercial Agreement unambiguously 

10 provides no right of unilateral, at‐will termination.  The District Court erred in 

11 concluding to the contrary.  The 1994 and 1998 License Agreements—either of 

12 whose termination would effect a termination of the Commercial Agreement, 

13 according to the 1994 and 1998 Letter Agreements—are similarly unambiguous 

14 in creating no right of unilateral, at‐will termination.  See 1994 and 1998 License 

15 Agreements ¶¶ 3.01, 11.01‐.03.  In light of this analysis of the text of the 

16 agreements, we need not decide whether the court erred in its appraisal of the 

17 extrinsic evidence of the parties’ intent:  That evidence is irrelevant in the face of 

 language of the Commercial Agreement, this reading, too, is silent as to the scope of 
 contemplated and permitted terminations.  
  
 26 
 1 the agreements’ unambiguous language. 

 2 We note that, in concluding that these contracts provide for no such 

 3 unilateral rights, we do not adopt the alternative reading identified by the 

 4 District Court and advocated by Luitpold.  At Luitpold’s urging, the District 

 5 Court reasoned that paragraph 9.03 was ambiguous because it might be read to 

 6 mean:  “‘A termination for any reason whatsoever, other than those reasons 

 7 specifically listed in 9.01 and 9.02 [and, presumably, 5.02,] is a breach of this 

 8 agreement, which will not discharge existing obligations of the breaching party 

 9 [and indeed, will subject the breaching party to liability for breach of contract].’”  

10 Luitpold II, 2013 WL 208908, at *6.  But this reading misunderstands the 

11 conventional relationship between “termination” and “breach.”  The terms of a 

12 contract should be construed according to their plain meaning, taking into 

13 account “the reasonable expectation and purpose of the ordinary 

14 business[person], in the factual context in which terms of art and understanding 

15 are used.”  Uribe v. Merchs. Bank of N.Y., 91 N.Y.2d 336, 341 (1998) (internal 

16 quotation marks omitted).  As the legal term is generally used in a contractual 

17 setting, a “termination” is said to “occur[] when either party pursuant to a power 

18 created by agreement or law puts an end to the contract otherwise than for its 

  
 27 
 1 breach,” U.C.C. § 2‐106(3) (2012); see also Restatement (Second) of Contracts § 283 

 2 (1981) cmt. a (quoting U.C.C. § 2‐106(3)), or pursuant to a right “accorded to a 

 3 party to a contract when the other party breaches a duty that arises under the 

 4 contract,” see Black’s Law Dictionary 1522 (10th ed. 2014).3  Crucially, however, 

 5 under neither the U.C.C. nor Black’s rendering do contract “terminations” 

 6 include “repudiations.”  See Restatement (Second) of Contracts § 250 (“A 

 7 repudiation is (a) a statement by the obligor to the obligee indicating that the 

 8 obligor will commit a breach that would of itself give the obligee a claim for 

 9 damages for total breach . . . or (b) a voluntary affirmative act which renders the 

10 obligor unable or apparently unable to perform without such a breach.”); see also 

11 id. § 253 (explaining when a repudiation may be treated as a breach).  Against the 

12 backdrop of these terms’ traditional usage, and in light of the other specific 

13 considerations described above, paragraph 9.03 can reasonably be interpreted to 

14 mean only that accrued duties and obligations of any breaching party survive 

15 termination of the agreement, except as otherwise specifically provided in the 

16 agreement. 

 3  The U.C.C. definition of “termination” includes a carve‐out for the act of putting to an end a  
 contract for its breach because the U.C.C. defines such an act, separately, as a “cancellation.” 
 See U.C.C. § 2‐106(4).
  
 28 
 1 Defendants urge that even if the Commercial Agreement did not provide 

 2 for unilateral, at‐will termination, we should affirm the grant of summary 

 3 judgment in their favor because the agreement was of indefinite term and 

 4 therefore, under New York law, terminable at will after a “reasonable time.”  

 5 Defs.’ Confidential Br. 33.  Defendants contend, further, that the summary 

 6 judgment grant can be affirmed on the additional alternative ground that the 

 7 damages sought by Luitpold—for lost profits—were not contemplated by the 

 8 parties in the agreement.   

 9 We may affirm a district court’s grant of summary judgment “on any basis 

10 for which there is a record sufficient to permit conclusions of law, including 

11 grounds upon which the district court did not rely.”  See Mauro v. So. New 

12 England Telecomms., Inc., 208 F.3d 384, 387 n.2 (2d Cir. 2000) (per curiam) (internal 

13 quotation marks omitted).  Whether to consider grounds not addressed by the 

14 district court is discretionary, however.  See CILP Assocs., L.P. v. Pricewaterhouse 

15 Coopers LLP, 735 F.3d 114, 127 (2d Cir. 2013); No Spray Coalition, Inc. v. City of N.Y., 

16 351 F.3d 602, 606 (2d Cir. 2003).  Because the issues presented by Defendants are 

17 multi‐faceted and may require examination of evidence going to the parties’ 

18 intent, we decline to address them in the first instance.  See, e.g., CILP Assocs., 735 

  
 29 
 1 F.3d at 127 (remanding where “the . . . issue is highly fact‐intensive and will 

 2 depend on an evaluation of expert witness reports and deposition testimony”).  

 3 We vacate the District Court’s grant of summary judgment in Defendants’ favor 

 4 and remand for its consideration of these issues.4 

 5  

 6 C. Summary Judgment on Geistlich’s Counterclaims 

 7 After the District Court disposed of Luitpold’s claims, both Luitpold and 

 8 Geistlich moved for summary judgment on Geistlich’s two remaining 

 9 counterclaims (the others having been dismissed).  Count II of the counterclaims 

10 alleged that Luitpold had breached the Commercial Agreement by failing to pay 

11 Geistlich the required “purchase price” for product purchased under the 

12 agreement.  Count III also alleged a breach of contract by Luitpold, based on 

13 Luitpold’s alleged failure to use its “best efforts” to develop markets in the 

14 covered territory for Geistlich products, and to execute an agreed‐upon business 

15 plan.  In an April 2013 decision and order, the District Court denied Geistlich’s 

16 motion for summary judgment and granted Luitpold’s motion, ruling that 

 4  As with our decision on the appeal from the District Court’s decision on Defendants’ motion  
 to dismiss, we leave it to the District Court and the parties on remand to address Osteomedical’s  
 status as a defendant. 
  
 30 
 1 Luitpold had not breached either of these contractual obligations to Geistlich.  

 2 See Luitpold III, 2013 WL 1651624, at *10. 

 3 On appeal, Geistlich contends that summary judgment should have been 

 4 granted in its favor on Count II, and that there existed genuine disputes of 

 5 material fact precluding the grant of summary judgment in Luitpold’s favor on 

 6 both counts.  We consider each of the dismissed counterclaims in turn, reviewing 

 7 the District Court’s decisions on summary judgment under the standards 

 8 described in Part B, above. 

 9  

10 1.  Luitpold’s alleged failure to pay the purchase price 

11   Under the pricing formula contained in Article VII of the Commercial 

12 Agreement, the purchase price owed by Luitpold to Geistlich on the Bio‐Oss 

13 Products, and later also on the Bio‐Gide Products, was a percentage of Luitpold’s 

14 “NET SALES” for the products, “unless agreed to otherwise in writing.”  

15 Commercial Agreement ¶ 7.01, as amended by Feb. 11, 1998 Amendment to 

16 Commercial Agreement ¶ 2.11.  “NET SALES” were defined under the 

17 agreement to mean “gross sales of PRODUCT in the TERRITORY less 

18 ALLOWABLE DEDUCTIONS.”  Commercial Agreement ¶ 1.07.  The allowable 

  
 31 
 1 deductions included, among others, “customary trade and cash discounts 

 2 actually allowed on PRODUCT sold,” “credit for allowances for damaged, 

 3 outdated or returned PRODUCT,” and “government rebates actually paid in 

 4 conjunction with sales of PRODUCT, if applicable.”  Id. ¶ 1.08(a)‐(c).  Paragraph 

 5 7.02 of the Commercial Agreement provided that “[t]erms of payment shall be 

 6 net sixty (60) days from the date of shipment.”  Id. ¶ 7.02.   

 7   The parties do not dispute that it would have been impossible for Luitpold 

 8 to pay Geistlich the purchase price described in the Commercial Agreement 

 9 within the 60‐day time frame stipulated in the agreement:  The purchase price 

10 depended on the total allowable deductions on Luitpold’s sales, which, the 

11 parties agree, could not have been known within 60 days of the product’s 

12 shipment by Geistlich.  Instead, within that 60‐day time frame, Luitpold paid to 

13 Geistlich the “transfer price” or “ex‐factory price” that Luitpold and Geistlich 

14 included as an additional term in the written purchase order and confirmation 

15 forms used in the transactions.  Luitpold never paid Geistlich any additional 

16 sum. 

17   In Count II of the counterclaims, Geistlich alleged that Luitpold breached 

18 the Commercial Agreement by failing to pay Geistlich the agreed‐upon purchase 

  
 32 
 1 price; Geistlich claimed damages in the amount of Luitpold’s underpayment, 

 2 plus interest as specified in the agreement.  See Countercl. of Def. Geistlich 

 3 (“Countercl.”) ¶ 34.  According to Geistlich, the parties understood that Luitpold 

 4 would make a “true‐up” payment to Geistlich to account for any underpayment 

 5 for its product after the purchase price was known.  See id. ¶ 32.  For years, the 

 6 total amount paid by Luitpold under the purchase order and confirmation forms 

 7 had exceeded the amount Luitpold would have owed under the Commercial 

 8 Agreement’s purchase price term, such that Geistlich benefited from the 

 9 discrepancy; but in 2006, the balance shifted to favor Luitpold, and by the end of 

10 2011, Luitpold had allegedly underpaid Geistlich by millions of dollars, see id. 

11   On the parties’ cross‐motions for summary judgment, the District Court 

12 granted summary judgment in Luitpold’s favor on Count II.  The court held that 

13 “the plain language of the [Commercial] Agreement preclude[d] the Court from 

14 implying a true‐up provision from the Agreement’s silence”; that the 

15 “undisputed facts [we]re sufficient to establish that the parties effectively 

16 modified the price term of the Agreement” through the written purchase order 

17 and confirmation forms; and that, “[n]otwithstanding [a] ‘no waiver’ provision” 

18 in the Commercial Agreement, Geistlich had waived its right to sue for breach on 

  
 33 
 1 the basis of Luitpold’s alleged underpayment because it had “acquiesced” in 

 2 Luitpold’s conduct “for seventeen years.”  Luitpold III, 2013 WL 1651624, at *8‐9.   

 3 Geistlich contends on appeal that the District Court erred in granting 

 4 summary judgment in Luitpold’s favor, and should instead have granted 

 5 summary judgment in its favor.  We agree with Geistlich that the District Court’s 

 6 grant of summary judgment to Luitpold on Count II was erroneous, but we 

 7 disagree that summary judgment should have been granted in Geistlich’s favor. 

 8 The District Court mistakenly concluded that there existed no genuine 

 9 dispute as to whether the purchase order and confirmation forms exchanged by 

10 the parties constituted written modifications of the purchase price term of the 

11 Commercial Agreement.  It is true that under paragraph 7.01 of the Commercial 

12 Agreement, “purchase price” is calculated as a certain percentage of net sales 

13 only if not “agreed to otherwise in writing” by the parties.  Commercial 

14 Agreement ¶ 7.01.  But it is hardly clear that the parties intended for their 

15 standard purchase order and confirmation forms to serve as such written 

16 modifications of the negotiated purchase price term. 

17 As a preliminary matter and significantly, the forms are ambiguous on 

18 their face with respect to whether they constitute modifications of the “purchase 

  
 34 
 1 price” term of the Commercial Agreement:  Luitpold’s forms include figures for 

 2 the “unit price” and “extended price” of the goods, but make no mention of 

 3 “purchase price” or the Commercial Agreement.  Geistlich’s forms refer to 

 4 “USD/Unit,” “Value,” “Cost of Goods,” and “Gross Value,” but, similarly, make 

 5 no mention of “purchase price” or the Commercial Agreement.  Because the 

 6 forms are ambiguous, summary judgment properly could have been granted in 

 7 Luitpold’s favor only if the evidence presented by the parties was so one‐sided 

 8 that no reasonable jury could have concluded that the forms did not modify the 

 9 Commercial Agreement’s purchase price term, or if Geistlich pointed to no 

10 relevant extrinsic evidence supporting its interpretation of the forms.  See 

11 Compagnie Financiere, 232 F.3d at 157‐58. 

12 Neither condition was met here.  In support of its position that the price 

13 paid under the purchase order and confirmation forms was not intended to 

14 substitute for the purchase price, Geistlich pointed to, among other things, 

15 evidence that the parties retained the Commercial Agreement’s characterization 

16 of “purchase price” as a percentage of net sales through their three formal 

17 amendments to the agreement in 1996, 1998, and 2008.  Geistlich also pointed to 

18 evidence that even Luitpold executives did not believe that the price paid under 

  
 35 
 1 the purchase order and confirmation forms substituted for the purchase price 

 2 owed under the Commercial Agreement.  This latter category of evidence 

 3 included: testimony of Luitpold’s Vice President of Finance, Mary Lent, that she 

 4 maintained a spreadsheet that tracked the difference between the amount due 

 5 under the Commercial Agreement and the amount paid under the purchase 

 6 order and confirmation forms; a copy of that spreadsheet; a 2002 letter from 

 7 Luitpold’s Customer Service Senior Manager to Dr. Geistlich explaining that 

 8 Luitpold had determined, accounting for net sales, that the actual price it had 

 9 paid for product in 2001 exceeded the parties’ agreed‐upon price, and requesting 

10 a remittance; and a 2006 email chain involving Mary Jane Helenek (by then 

11 Luitpold’s President and Chief Executive Officer) discussing a possible 

12 modification to the purchase order form that might enable Luitpold to avoid 

13 being required to pay what the Luitpold executives themselves referred to as a 

14 “true‐up,” since by that time Luitpold (rather than Geistlich) would have owed 

15 money under the purchase price term of the Commercial Agreement.  

16 Construing the evidence in the light most favorable to Geistlich, a reasonable 

17 jury easily could have found that the parties intended for the payments made 

18 under the purchase order and confirmation forms to be subject to adjustment 

  
 36 
 1 once the purchase price described in the Commercial Agreement could be 

 2 calculated. 

 3 The District Court discounted evidence that Luitpold believed a true‐up 

 4 might be necessary on the ground that the Commercial Agreement was 

 5 unambiguous in making no provision for such a true‐up.  See Luitpold III, 2013 

 6 WL 1651624, at *8 n.7.  In our view, the District Court’s reasoning in this regard 

 7 was misguided in at least two respects.  First, the court ignored that—regardless 

 8 of whether the Commercial Agreement envisioned a true‐up—Luitpold’s 

 9 subjective belief as to whether a true‐up was necessary was relevant to whether 

10 Luitpold intended to modify the purchase price provision of the Commercial 

11 Agreement through its purchase order forms.  A reasonable jury could have 

12 concluded that Luitpold’s apparent belief that a true‐up would be necessary 

13 indicated that Luitpold did not intend to modify the purchase price term of the 

14 Commercial Agreement through its purchase order forms. 

15 Second, the court erred in concluding that the plain language of the 

16 Commercial Agreement precluded the court (and presumably, any factfinder) 

17 from identifying a true‐up provision implicit in the agreement.  Apparent 

18 internal inconsistencies within a contract can suggest ambiguity, which can then 

  
 37 
 1 be addressed through extrinsic evidence.  See, e.g., Fed. Ins. Co. v. Americas Ins. 

 2 Co., 691 N.Y.S.2d 508, 512 (App. Div. 1st Dep’t 1999); Bianculli v. Bianculli, 663 

 3 N.Y.S.2d 217, 220 (App. Div. 2d Dep’t 1997).  And where a term “‘may be fairly 

 4 and reasonably fixed by the surrounding circumstances and the parties’ intent,’” 

 5 it may be treated as implied in the contract and supplied by the court.  In re World 

 6 Trade Ctr. Disaster Site Litig., 754 F.3d 114, 122 (2d Cir. 2014) (quoting Haines v. 

 7 City of N.Y., 41 N.Y.2d 769, 772 (1977)).  Here, the requirement under the 

 8 Commercial Agreement that Luitpold pay Geistlich for Geistlich’s product within 

 9 60 days of shipment, see Commercial Agreement ¶ 7.02, where the agreed‐upon 

10 purchase price for that product could not be determined within the 60‐day time 

11 frame, see id. ¶¶ 7.01, 1.07‐.08, created an ambiguity within the contract as to 

12 whether the “payment” due within 60 days of shipment was for the full purchase 

13 price or some tentative estimate.  Since the apparent inconsistency among its 

14 terms rendered the Commercial Agreement ambiguous with respect to the 

15 amount and the timing of the payment due, the District Court erred by 

16 concluding that the contract, as a matter of law, could not support an implied 

17 true‐up provision. 

18   We cannot accept as an alternative basis for upholding the summary 

  
 38 
 1 judgment grant in Luitpold’s favor the District Court’s conclusion that Geistlich 

 2 waived its right to sue for this alleged breach of contract.  A contractual right 

 3 may be waived if it is “knowingly, voluntarily and intentionally abandoned.”  

 4 Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P., 7 N.Y.3d 96, 104 

 5 (2006).  But “waiver should not be lightly presumed and must be based on a clear 

 6 manifestation of intent to relinquish a contractual protection.”  Id. (internal 

 7 quotation marks omitted).   “[M]ere silence, oversight or thoughtlessness in 

 8 failing to object” is insufficient to support an inference of waiver.  Courtney‐Clarke 

 9 v. Rizzoli Int’l Publ’ns, Inc., 676 N.Y.S.2d 529, 529 (App. Div. 1st Dep’t 1998). 

10   There remains a genuine dispute as to whether Geistlich waived its right to 

11 sue under the purchase price term of the Commercial Agreement.  The 

12 Commercial Agreement provides that “no[] . . . waiver of any terms or provisions 

13 hereof shall be deemed valid unless in writing and signed by the parties 

14 signatory hereto.”  Commercial Agreement ¶ 19.03.  On appeal, Luitpold does 

15 not argue, and points to no evidence suggesting, that the parties ever waived the 

16 purchase price term of the Commercial Agreement in writing.  This in itself does 

17 not end the inquiry, however, because a so‐called “no‐waiver” clause may itself 

18 be impliedly waived under certain circumstances.  See 510 Joint Venture v. Solcoor, 

  
 39 
 1 Inc., 575 N.Y.S.2d 897, 899 (App. Div. 2d Dep’t 1991).  But the presence of such a 

 2 clause means that for summary judgment to have been properly granted in 

 3 Luitpold’s favor on waiver grounds, the evidence, viewed in the light most 

 4 favorable to Geistlich, must have unequivocally demonstrated not only that the 

 5 parties intended to waive the purchase price term of the Commercial Agreement, 

 6 but that they intended for the “no‐waiver” clause to have no effect.  This was far 

 7 from the case.  Evidence of Geistlich’s delay in bringing suit and its failure earlier 

 8 to notify Luitpold of any breach—the only evidence of waiver to which Luitpold 

 9 points—easily could be understood to reflect a belief on the part of Geistlich that 

10 immediate suit was unnecessary or was unwarranted because a financial 

11 reconciliation would occur eventually.  As described above, Geistlich has put 

12 forward ample evidence demonstrating that both parties believed that a true‐up 

13 would be necessary to reconcile the difference between the price Luitpold 

14 actually paid for the product and the purchase price Luitpold owed under the 

15 Commercial Agreement. 

16   As to Geistlich’s further contention that summary judgment should have 

17 been granted in its favor on Count II, we disagree.  Construing the evidence in 

18 the light most favorable to Luitpold, and drawing all reasonable inferences in 

  
 40 
 1 Luitpold’s favor—as we must, on Geistlich’s motion—we cannot conclude that a 

 2 reasonable jury would have been required to find Luitpold liable for breach.  The 

 3 purchase price and due date terms of the Commercial Agreement were 

 4 inconsistent, and the record contains evidence that Geistlich accepted payment 

 5 under the terms of the purchase order and confirmation forms, and failed for 

 6 years to bring suit or complain of underpayment.  Together, this evidence creates 

 7 genuine disputes—both as to whether Luitpold was obligated to pay the 

 8 purchase price described in the Commercial Agreement, and as to whether 

 9 Geistlich waived its right to sue under the purchase price term. 

10  
11 2.  Luitpold’s alleged failure to use its best efforts 

12 Under paragraph 2.02 of the Commercial Agreement, Luitpold “agree[d] 

13 that it w[ould] use its best efforts to expeditiously enter and develop markets in 

14 and to the PRODUCT for the FIELD OF USE in the TERRITORY and w[ould] use 

15 its best efforts to commence execution of the business plan . . . within forty five 

16 (45) days after signing th[e] COMMERCIAL AGREEMENT and thereafter 

17 w[ould] use its best efforts to continue the execution of the business plan.”  

18 Commercial Agreement ¶ 2.02.   In Count III of the counterclaims, Geistlich 

  
 41 
 1 alleged that Luitpold breached this “best efforts” obligation when it entered into 

 2 an agreement with a third party to sell a product called “GEM21S” that aimed to 

 3 do what Bio‐Oss was designed to accomplish; promoted GEM21S to Geistlich 

 4 customers; and ceased to use appropriate marketing methods to promote 

 5 Geistlich products.  See Countercl. ¶¶ 35‐45.5 

 6 The District Court, highlighting record evidence that Geistlich had been 

 7 aware of Luitpold’s efforts to market and sell GEM21S by December 2003 and 

 8 had communicated its concerns to Luitpold in June 2004, concluded that 

 9 Luitpold was entitled to summary judgment on Count III on two grounds.  The 

10 court held, first, that “the doctrine of election of remedies preclude[d] such a 

11 belated claim”; and second, that “[a]t best, . . . [Geistlich’s] claim[] expired by 

12 June 2010.”  Luitpold III, 2013 WL 1651624, at *9‐10. 

13   The doctrine of election of remedies generally prevents a party that has 

14 chosen to assert one of two inconsistent rights from later seeking to vindicate the 

15 alternative right.  See Clark v. Kirby, 243 N.Y. 295, 303 (1926); Schenck v. State Line 

 5  Count III also alleged that Luitpold breached its best efforts obligation through the sale of 
 another competing product beginning in January 2012.  See Countercl. ¶ 53.  The District Court 
 noted that this conduct post‐dated the termination of the agreement and thus declined to take it 
 into account.  See Luitpold III, 2013 WL 1651624, at *6 n.4.  On appeal, Geistlich does not 
 challenge this decision and focuses instead on Luitpold’s conduct relating to GEM21S. 

  
 42 
 1 Tel. Co., 238 N.Y. 308, 311 (1924); 331 E. 14th St. LLC v. 331 East Corp., 740 N.Y.S.2d 

 2 327, 328 (App. Div. 1st Dep’t 2002).   The District Court interpreted the doctrine to 

 3 preclude a party from suing for damages based on a breach once that party, with 

 4 knowledge of the breach, has continued to accept performance from the 

 5 breaching party.  See Luitpold III, 2013 WL 1651624, at *10.  But New York law 

 6 does not treat as inconsistent the right to continue to perform and to accept 

 7 performance under a contract (on the one hand) and the right to sue for damages 

 8 based on a breach (on the other):  “A party to an agreement [that] believes [the 

 9 agreement] has been breached may elect to continue to perform the agreement” 

10 and later sue for the alleged breach, so long as that party does not waive its right 

11 to sue by, inter alia, failing timely to notify its counterparty of the breach.  Capital 

12 Med. Sys. Inc. v. Fuji Med. Sys., U.S.A. Inc., 658 N.Y.S.2d 475, 478 (App. Div. 3d 

13 Dep’t 1997); see also Syracuse Orthopedic Specialists, P.C. v. Hootnick, 839 N.Y.S.2d 

14 897, 900 (App. Div. 4th Dep’t 2007) (quoting Capital Med. Sys. Inc.).  Geistlich’s 

15 decision not to terminate the agreement after first discovering Luitpold’s breach 

16 thus did not in itself bar Geistlich, under the election of remedies doctrine, from 

17 suing for damages based on that breach.  Further, in light of evidence of 

18 communications from Geistlich to Luitpold raising concerns with Luitpold’s 

  
 43 
 1 marketing and sale of GEM21S, there remains a genuine dispute as to whether 

 2 Geistlich provided timely notice of any breach.  As a result, the District Court’s 

 3 grant of summary judgment to Luitpold on Geistlich’s best efforts claim cannot 

 4 be affirmed on the basis of waiver, either. 

 5   The District Court’s conclusion that summary judgment in Luitpold’s favor 

 6 was warranted on timeliness grounds was also erroneous.  We accept the court’s 

 7 preliminary determination that, to have been timely, the best efforts claim would 

 8 have had to be based on conduct occurring in or after September 2004, see 

 9 Luitpold III, 2013 WL 1651624, at *10.  Luitpold does not challenge the court’s 

10 reasoning that a “tolling agreement” described by the parties in their pleadings, 

11 and entered as early as September 2010, see Compl. ¶ 39; Defs.’ Answer ¶ 39, 

12 would have suspended the running of any statutes of limitations until Geistlich’s 

13 counterclaims were filed, and that New York’s six‐year statute of limitations for 

14 breach of contract actions, see N.Y. C.P.L.R. 213, governs.  See Luitpold’s 

15 Corrected Confidential Reply Br. 54.  But we disagree with the District Court’s 

16 conclusion that Geistlich’s claim was time‐barred because it was “based on 

17 Luitpold’s decision to begin marketing GEM21S,” Luitpold III, 2013 WL 1651624, 

18 at *10. 

  
 44 
 1 Viewing the evidence in the light most favorable to Geistlich, and drawing 

 2 all reasonable inferences in Geistlich’s favor, there remains a genuine dispute as 

 3 to whether Geistlich’s claim accrued by September 2004.  Geistlich’s claim of 

 4 breach was actually based on Luitpold’s alleged failure to “exercise its ‘best 

 5 efforts’ to develop markets in and to GEISTLICH products and to execute [an 

 6 agreed‐upon] business plan.”  Countercl. ¶ 36.  We cannot say, at summary 

 7 judgment and on the record before us, that the parties understood that Luitpold 

 8 would necessarily be in breach of its best efforts obligation when it “deci[ded] to 

 9 begin marketing GEM21S,” Luitpold III, 2013 WL 1651624, at *10.  And as a result, 

10 evidence that Luitpold made plans before September 2004 to market a competing 

11 product—the focus of the District Court’s ruling—need not be treated as proof 

12 that Luitpold failed to exert its best efforts to promote Geistlich’s products at that 

13 time.  Indeed, other evidence in the record suggests that any actionable breach 

14 may have occurred much later.  As Geistlich argues, record evidence indicates 

15 that it was not until November 2005—when GEM21S received premarket 

16 approval from the Food and Drug Administration—that Luitpold actually 

17 launched GEM21S.  Other record evidence suggests that Geistlich did not see a 

18 decline in its sales until mid‐2006.  Summary judgment in Luitpold’s favor on 

  
 45 
 1 Count III was improper.6 

 2  

 3 CONCLUSION 

 4 For the reasons set forth above, the District Court erred in its dismissal of 

 5 Counts IV and VI of the Complaint; erred in its grant of summary judgment to 

 6 Defendants on Counts I, II, V, and VII of the Complaint; and erred in its grant of 

 7 summary judgment to Luitpold on Counts II and III of Geistlich’s counterclaims.  

 8 In summary:  

 9  Count I, Requesting Declaratory Relief:  We vacate the judgment insofar as 

10 it granted summary judgment to Defendants, and remand for 

11 consideration of arguments on indefinite term and lost profits. 

12  Count II, Alleging Repudiation of the Commercial Agreement and the 1994 

13 License Agreement:  We vacate the judgment insofar as it granted 

14 summary judgment to Defendants, and remand for consideration of 

15 arguments on indefinite term and lost profits. 

 6  In supplemental briefing filed with the Court after this case was argued, Luitpold raises issues  
 regarding Geistlich’s damages expert as an alternative basis for affirmance with respect to 
 Geistlich’s counterclaims.  We do not reach the question of damages in rendering our decision 
 and thus leave it to the District Court, on remand, to consider these issues in the first instance.
  
 46 
 1  Count IV, Alleging Breach of the Exclusive License Provisions of the 1994 

 2 License Agreement:  We vacate the judgment insofar as it granted 

 3 Defendants’ motion to dismiss.  Count IV may proceed to discovery, to 

 4 the extent necessary, and then to summary judgment briefing and, if 

 5 appropriate, to trial. 

 6  Count V, Alleging Repudiation of the 1998 License Agreement:  We vacate 

 7 the judgment insofar as it granted summary judgment to Defendants, 

 8 and remand for consideration of arguments on indefinite term and lost 

 9 profits. 

10  Count VI, Alleging Breach of the Exclusive License Provisions of the 1998 

11 License Agreement:  We vacate the judgment insofar as it granted 

12 Defendants’ motion to dismiss.  Count VI may proceed to discovery, to 

13 the extent necessary, and then to summary judgment briefing and, if 

14 appropriate, to trial. 

15  Count VII, Requesting Prejudgment Attachment of Patents and Trademarks:  

16 We vacate the judgment insofar as it granted summary judgment to 

17 Defendants, and remand for consideration of arguments on indefinite 

18 term and lost profits. 

  
 47 
 1  Count II of the Counterclaims, Alleging Breach by Failure to Pay “Purchase 

 2 Price”:  We vacate the judgment insofar as it granted summary 

 3 judgment to Luitpold, and remand for consideration of Luitpold’s 

 4 arguments relating to Geistlich’s damages expert. 

 5  Count III of the Counterclaims, Alleging Breach of “Best Efforts” Provision:  

 6 We vacate the judgment insofar as it granted summary judgment to 

 7 Luitpold, and remand for consideration of Luitpold’s arguments 

 8 relating to Geistlich’s damages expert. 

 9 Accordingly, we VACATE the judgment of the District Court and 

10 REMAND for further proceedings consistent with this opinion. 

  
 48